**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PRESIDIO HOLDINGS INC., PRESIDIO NETWORKED SOLUTIONS LLC, and PRESIDIO NETWORKED SOLUTIONS GROUP, LLC, | ) ) ) ) ) | Case No. 24-cv-2912 |
| | ) | Hon. Judge Edmond E. Chang |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| PEOPLE DRIVEN TECHNOLOGY, INC., PAUL BREHM, STEVEN KUNDERT, and ANGELA SPLINTER, | ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Kevin M. Cloutier (ARDC #6273805)
David M. Poell (ARDC #6302765)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Email: kcloutier@sheppardmullin.com
           dpoell@sheppardmullin.com

Robert S. Friedman (*pro hac vice*)
Shin Hahn (*pro hac vice*)
Joshua I. Schlenger (*pro hac vice*)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, New York 10112
Tel:  (212) 653-8700
Email: rfriedman@sheppardmullin.com
           shahn@sheppardmullin.com
           jschlenger@sheppardmullin.com

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................1

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND .............................3

ARGUMENT .............................................................................................................15

I.      STANDARD FOR PRELIMINARY INJUNCTION UNDER RULE 65........................15

II.     PRESIDIO WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT
A PRELIMINARY INJUNCTION.....................................................................16

III.    PRESIDIO HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS..........18

       A.     Presidio Will Likely Succeed on the Merits of Its Trade Secret
Misappropriation Claims Under Illinois, Wisconsin, and Federal Law ...............18

             i.      The Statutory Definition of "Trade Secret" is Materially Identical
Under Federal, Illinois and Wisconsin Law. ...............................................19

             ii.     Presidio's pricing and customer information constitute trade
secrets......................................................................................................19

             iii.    Presidio invests in and protects its trade secrets. .....................................21

             iv.    The evidence demonstrates misappropriation of trade secrets. .................22

       B.     Presidio is Likely to Succeed on Its Breach of Contract Claims ..........................27

       C.     Presidio is Likely to Succeed on the Merits of its Tortious Interference
Claims ..............................................................................................................29

             i.      PDT tortiously interfered with the Agreements...........................................29

             ii.     At PDT's direction, the Former Employees utilized wrongful
means to divert opportunities from Presidio to PDT. ................................30

IV.    THE BALANCE OF HARDSHIPS STRONGLY FAVORS PRESIDIO AND
THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL NOT DISSERVE
THE PUBLIC INTEREST.................................................................................31

CONCLUSION...........................................................................................................33

TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*A.C. by M.C. v. Metro. Sch. Distr. of Martinsville*
75 F.4th 760 (7th Cir. 2023) ............................................................15, 16

*Allied Waste Servs. of N. Am., LLC v. Tibble*
177 F. Supp. 3d 1103 (N.D. Ill. 2016) ..............................................18, 24

*Aon PLC v. Infinite Equity, Inc.*
2021 WL 4192072 (N.D. Ill. Sept. 15, 2021) ...............................20, 24, 32

*Aon Risk Servs. Cos., Inc. v. Alliant Ins. Servs., Inc.*
415 F. Supp. 3d 843 (N.D. Ill. 2019) ......................................................22

*Aptargroup, Inc. v. Chamulak*
2019 WL 2425175 (N.D. Ill. Jun. 10, 2019) ...........................................18

*B.C. Ziegler Co. v. Ehren*
414 N.W.2d 48 (Wis. Ct. App. 1987) .....................................................21

*Brew City Redevelopment Grp., LLC v. Ferchill Grp.*
714 N.W.2d 582 (Wis. Ct. App. 2006) ...................................................27

*Brunswick Corp. v. Jones*
784 F.2d 271 (7th Cir. 1986) .................................................................32

*Centrifugal Acquisition Corp., Inc. v. Moon*
849 F. Supp. 2d 814 (E.D. Wis. 2012).....................................................21

*E\*TRADE Fin. Corp. v. Pospisil*
2018 WL 4205401 (N.D. Ill. Sept. 4, 2018) ...........................................17

*Fields Found., Ltd. v. Christensen*
309 N.W.2d 125 (Wis. Ct. App. 1981) ...................................................28

*Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*
2013 WL 1446425 (N.D. Ill. Apr. 9, 2013) ............................................28

*Groupon, Inc. v. Shin*
2022 WL 60526 (N.D. Ill. Jan. 6, 2022).................................16, 24, 26, 31, 32

*GSI Grp., L.L.C. v. Chief Indus.*
2021 WL 6143551 (C.D. Ill. Mar. 8, 2021)..............................16, 29, 30

*HCA Franchise Corp. v. Alisch*
2016 WL 10706285 (N.D. Ind. Aug. 12, 2016)........................................17

*IFS Filing Sys. LLC v. 11225 Heather LLC*
    923 N.W.2d 176, 2018 WL 5920614 (Wis. Ct. App. Nov. 13, 2018) ....................................30

*Jim Mullen Charitable Found. v. World Ability Fed'n, NFP*
    917 N.E.2d 1098 (Ill. App. Ct. 2009) ........................................................................30

*Lakeview Tech., Inc. v. Robinson*
    446 F.3d 655 (7th Cir. 2006) ..................................................................................32

*Life Spine, Inc. v. Aegis Spine, Inc.*
    8 F.4th 531 (7th Cir. 2021) ..............................................................................16, 31

*Lucini Italia Co. v. Grappolini*
    2003 WL 1989605 (N.D. Ill. April 28, 2003) ..............................................................33

*McElroy, Inc. v. Delaney*
    389 N.E.2d 1300 (Ill. App. Ct. 1979) .......................................................................28

*Medcor, Inc. v. Garcia*
    2022 WL 124163 (N.D. Ill. Jan. 13, 2022) .................................................................29

*Mickey's Linen v. Fischer*
    2017 WL 3970593 (N.D. Ill. Sept. 8, 2017) ..................................17, 18, 22, 23, 24, 26, 32, 33

*Millard Maint. Serv. Co. v. Bernero*
    566 N.E.2d 379 (Ill. App. Ct. 1990) .........................................................................28

*Mintel Int'l Group, Ltd. v. Neergheen*
    2008 WL 2782818 (N.D. Ill. Jul. 16, 2008) ................................................................17

*Molon Motor & Coil Corp. v. Nidec Motor Corp.*
    2017 WL 1954531 (N.D. Ill. May 11, 2017) ...............................................................25

*Moss Holding Co. v. Fuller*
    2020 WL 1081730 (N.D. Ill. Mar. 6, 2020) ................................................................24

*Packaging Corp. of Am., Inc. v. Croner*
    419 F. Supp. 3d 1059 (N.D. Ill. 2020) ......................................................................24

*People Driven Technology, Inc. v. Presidio Inc.*
    2023 WL 4932078 (E.D. Mich. Aug. 2, 2023) ............................................................27

*PepsiCo, Inc. v. Redmond*
    54 F.3d 1262 (7th Cir. 1995) .............................................................................21, 24

*Presidio, Inc. v. People Driven Technology, Inc.*
    2023 WL 5178345 (S.D. Ohio, Aug. 11, 2023) ...........................................................27

*Radiator Exp. Warehouse, Inc. v. Shie*
    708 F. Supp. 2d 762 (E.D. Wis. 2010)............................................................18, 19

*Reliable Fire Equip. Co. v. Arredondo*
    965 N.E.2d 393 (Ill. 2011) ..............................................................................27

*RKI, Inc. v. Grimes*
    177 F. Supp. 2d 859 (N.D. Ill. 2001) ............................................................19, 21

*Strata Mktg., Inc. v. Murphy*
    317 Ill. App. 3d 1054 (1st Dist. 2000) ..........................................................22, 24

*Techworks, LLC v. Wille*
    770 N.W.2d 727 (Wis. Ct. App. 2009) ..........................................................28

*Vendavo, Inc. v. Long*
    397 F. Supp. 3d 1115 (N.D. Ill. 2019) ..........................................................20, 21

*W. Capra Consulting Grp., Inc. v. Snyder*
    2019 WL 3935045 (N.D. Ill. Aug. 20, 2019) ................................................31

*Wolff v. Bethany N. Suburban Grp.*
    197 N.E.3d 77 (1st Dist. 2021) ......................................................................27

<u>Statutes</u>

765 ILCS 1065/1 ....................................................................................................15, 18, 19, 24

765 ILCS 1065/2(d) ...............................................................................................19

765 ILCS 1065/3(a) ...............................................................................................18

18 U.S.C. § 1836 ....................................................................................................15, 18, 19, 24

18 U.S.C. § 1836(b)(3) ..........................................................................................18

18 U.S.C. § 1893(3) ...............................................................................................19

Wis. Stat. § 134.90.................................................................................................15, 18, 19

Wis. Stat. § 134.90(1)(c)........................................................................................19

Wis. Stat. § 134.90(3)............................................................................................18

<u>Other Authorities</u>

Federal Rules of Civil Procedure Rule 65 .............................................................1, 15

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs Presidio Holdings Inc., Presidio Networked Solutions LLC, and Presidio Networked Solutions Group, LLC (collectively, "Plaintiffs" or "Presidio") respectfully move for a preliminary injunction enjoining Defendants People Driven Technology, Inc. ("PDT"), Paul Brehm ("Brehm"), Angela Splinter ("Splinter"), and Steven Kundert ("Kundert," and together with Brehm and Splinter, the "Former Employees") (collectively with PDT, "Defendants") from using or disclosing Presidio's confidential, proprietary, and trade secret information. Presidio also seeks a forensic review of certain accounts and devices of the Former Employees and PDT, and the return of any Presidio confidential information that is found to be in Defendants' possession.

Pursuant to this Court's standing order, undersigned counsel met and conferred with opposing counsel to determine whether Defendants oppose the relief requested by this Motion. Defendants oppose this Motion.

## PRELIMINARY STATEMENT

PDT and the three Former Employees brazenly misappropriated Presidio's trade secrets and confidential information to facilitate the theft of Presidio's customers and business opportunities. In doing so, the Defendants in this case perpetrated the same type of tortious activities that Presidio and PDT previously litigated in multiple jurisdictions. Less than a year ago, Presidio, PDT and multiple individual defendants voluntarily resolved the previous lawsuits by entering into a settlement agreement. But now, PDT is at it again. Instead of moving on, it has jumpstarted another illegal campaign designed to misappropriate Presidio's trade secrets and confidential information—this time in Illinois and Wisconsin. Unless Defendants are enjoined from using Presidio's trade secrets and confidential information, and ordered to return it to Presidio pending the resolution of this litigation, Plaintiffs will be irreparably harmed by Defendants' retention of such information and the resultant loss of customers to PDT.

-1-

Based on the forensic review of the Former Employees' Presidio-issued laptops and their Presidio emails, there is overwhelming evidence that the Former Employees have misappropriated Presidio's trade secrets and other confidential information in violation of their statutory, contractual, and common law duties. Specifically, Presidio has uncovered that Defendant Kundert, who was a Senior Account Manager at Presidio, intentionally delayed multiple sales opportunities for various services and sale of hardware to the fall of this year in order to divert those opportunities to PDT. In order to cover up such conduct, during his last days at Presidio, Kundert deleted thousands of emails and files both from his Presidio email account and Presidio laptop, while also deleting his web-browsing history. Similarly, Brehm (another Senior Account Manager at Presidio), intentionally let multiple sales opportunities for Presidio customers and deal registrations with Original Equipment Manufacturers and partners expire during his final weeks at Presidio. Those opportunities and deal registrations are now with PDT and Brehm is currently working on those same accounts on behalf of PDT. Brehm also deleted thousands of emails during his last days at Presidio and possesses a confidential Presidio spreadsheet that contains highly sensitive pricing and margin information. Finally, Defendant Splinter, an Inside Client Manager based in Illinois, who worked closely with Kundert and Brehm while at Presidio, used her Gmail account to store certain Presidio documents and also deleted thousands of files from her Presidio laptop immediately before her resignation. These preliminary forensic findings constitute strong evidence of a coordinated plan by the four Defendants working together and avoid detection.

Shortly after the Defendants joined PDT, PDT diverted multiple opportunities for Presidio's customers, including the opportunities for Presidio customers REDACTED REDACTED ("REDACTED"), REDACTED ("REDACTED") and REDACTED. Kundert and Brehm both worked for those customers while at Presidio.

Presidio will demonstrate a strong likelihood of success on the merits of its trade secret misappropriation claims under federal and state laws, breach of contract claims, and tortious interference claims. Defendants will not suffer any hardship from an injunction, that enjoins them from using Presidio's trade secrets and confidential information, and the return of such information. But Presidio will undoubtedly suffer irreparable harm if Defendants are permitted to use and operationalize such information to gain an unfair competitive advantage that will cause Presidio to lose customers and valuable goodwill. Without injunctive relief, Defendants will continue to improperly use and disclose Presidio's trade secrets and confidential information with impunity. Accordingly, Presidio respectfully requests that the Court issue a preliminary injunction requiring the return and safeguarding of Presidio's confidential and trade secret information and an independent forensic review of Defendants' devices and accounts.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The facts that support Presidio's Motion for a Preliminary Injunction (the "Motion"), are set forth in greater detail in the Complaint filed on April 11, 2024 ("Complaint" or "Compl.") and in the accompanying Declarations of Richard Dykhoff ("Dykhoff Decl."), Alicia Korreck ("Korreck Decl."), Alexandria Diamandis ("Diamandis Decl."), Alex Barnett ("Barnett Decl."), and Michael Scatton ("Scatton Decl."). The facts most pertinent to Presidio's Motion are summarized below.

### A. Presidio's Business

Presidio provides professional and managed services and products for advanced IT solutions, including design implementation and services for data storage, information security, cybersecurity, and cloud computing capabilities. (Dykhoff Decl. ¶ 3.) To protect its confidential information and trade secrets, Presidio requires its employees to execute confidentiality and non-solicitation agreements upon hire. (Korreck Decl. ¶ 3.) Presidio also requires its employees,

including the Former Employees, to review, acknowledge, and at all times, subscribe to the provisions and obligations set forth in Presidio's "Employee Handbook & Code of Conduct" (the "Employee Handbook"), which, *inter alia*, states that any "work product" including "inventions, discoveries, ideas, improvements, software programs, artwork and works of authorship," "belong[s] to [Presidio]." (*Id.*) All Presidio employees, including the Former Employees, are trained regarding the provisions of and compliance with the Employee Handbook. (*Id.*)

Presidio also requires employees to review and acknowledge the contents of its "Confidentiality Policy," which states that "all non-public information that has or could have commercial value or other utility in the business in which Presidio or its Clients are engaged or in which they contemplate engaging. . . . must not be used or disclosed to anyone outside Presidio, either directly or indirectly[.]" (Korreck Decl. ¶ 4.) As Presidio employees, the Former Employees acknowledged and reaffirmed their commitment to the requirements of the Employee Handbook (including the Confidentiality Policy) on an annual basis, most recently in 2023. (*Id.*)

### B.     The Former Employees' Agreements with Netech and Presidio

Brehm and Kundert were both Senior Account Managers at Presidio, (Korreck Decl. ¶¶ 9, 14), and Splinter was an Inside Client Manager at Presidio. (Diamandis Decl. ¶ 4.) All three Former Employees signed a "Confidentiality/Non-Solicitation Agreement" with Netech (the "Agreements"). (Korreck Decl. ¶¶ 11, 15; Diamandis Decl. ¶ 5.) Pursuant to Section 1 of the Agreements, the Former Employees agreed that they would, "at all times (both during [their] employment with Netech and thereafter) keep all Proprietary Information in confidence and will not directly or indirectly use or disclose any Proprietary Information or anything relating to it without written consent from an officer of Netech, except as may be necessary in [*sic*] ordinary course of performing [their] duties for Netech." (Korreck Decl. Exhs D & F; Diamandis Decl. Ex. B.) "Proprietary Information" is defined in the Agreements to mean proprietary information about

-4-

Netech's business, owned and developed by Netech, "which derives value by not being generally known to Netech's competitors." (Korreck Decl. Exhs D & F; Diamandis Decl. Ex. B.)

Moreover, under Section 2 of the Agreements, the Former Employees "recognize[d] that all Proprietary Information, however stored or kept, and all keys, access codes, sales data, notes, tools, documents, records, and other equipment or property which Netech shares with, provides, or makes available to me are the sole property of Netech." (Korreck Decl. Exhs D & F; Diamandis Decl. Ex. B.) The Former Employees pledged to "use such property solely for the benefit of Netech and for no other purpose." (*Id.*) The Former Employees further agreed that, "[u]pon the cessation of [their] employment with Netech, [they] shall (i) refrain from taking any such property from Netech's premises, and (ii) immediately return to Netech any such property which may be in [his] possession or control (including any and all copies thereof)." (*Id.*)

Pursuant to Section 4 of the Agreements, the Former Employees "agree[d] that it would be difficult to measure damages to Netech from any breach of covenants contained in this Agreement, but that such damages from any breach would be great, incalculable, and irremediable, and that damages would be an inadequate remedy." (Korreck Decl. Exhs D & F; Diamandis Decl. Ex. B.) Accordingly, the Former Employees agreed "to waive any claim that Netech has an adequate remedy at law and further agree[d] that Netech may have specific performance of the terms of this Agreement in any Court having jurisdiction." (*Id.*) Under Section 5, the Former Employees agreed that "the rights and obligations of Netech under this Agreement shall inure [*sic*] to the benefit and be binding upon Netech's successors and assigns." (*Id.*)

## C. Presidio Purchases Netech for Hundreds of Millions of Dollars

James Engen ("Engen") founded Netech Corporation ("Netech") in 1996. (Dykhoff Decl. ¶ 5.) Until the sale of Netech to Presidio in 2016, Netech functioned as a privately held, family-owned, IT services and solutions integrator, headquartered in Michigan. (Compl. ¶ 30.) Pursuant

to an Asset Purchase Agreement dated December 31, 2015 (the "APA"), Presidio purchased the entirety of the Netech business for approximately $250 million. (*Id.* ¶ 44.) The Presidio counterparties to the APA were Presidio Infrastructure Solutions LLC (as "Buyer") ("Presidio Infrastructure"), a Delaware limited liability company, then a wholly owned subsidiary of Plaintiff Presidio Networked Solutions Group, LLC ("PNSG"), and Presidio Holdings Inc. ("Presidio Holdings") as "Parent." (*Id.* ¶ 45.) Engen served as the Netech Shareholder Representative for purposes of the APA. (*Id.*)

As part of that purchase, Presidio assumed Netech's contracts with its then-current employees who would become Presidio employees upon the closing, including the Agreements. (Compl. ¶ 47.) Specifically, Presidio acquired (with certain exceptions not applicable here) "all of Seller's rights existing under Contracts relating to or arising out of the Business" (APA § 1.1(b)(iv)), and—with respect to "Transferred Employees" like the Former Employees—assumed "all Liabilities and obligations with respect to Transferred Employees." (*Id.*) Presidio also acquired "subject to any restrictions under applicable Law, employment and personnel records related to the Transferred Employees." (*Id.*) The APA closed on February 1, 2016. (*Id.* ¶ 48.)

Presidio and Netech entered into an Assignment and Assumption Agreement to consummate the assignment contemplated by the APA. (Compl. ¶ 49.) Section 2 of the Assignment and Assumption Agreement provided that Netech "sells, assigns, transfers, conveys and delivers to Buyer [Presidio Infrastructure] all right, title and interest of Seller in and to the Transferred Assets"—including the Agreements—and Presidio Infrastructure "accepts such sale, assignment, transfer, conveyance and delivery." (*Id*. ¶ 50.) Section 6 provided explicitly that "Parent"—that is, Presidio Holdings—is an "express and intended third party beneficiar[y] of this Assignment," and "shall be entitled to exercise all rights and remedies granted to Buyer under this

Assignment and to enforce this Assignment on behalf of and/or in the name of Buyer." (*Id*. ¶ 51.) In addition, Section 4 of the Assignment and Assumption Agreement provided that "[t]he terms of this Agreement will be binding upon, inure to the benefit of and be enforceable by and against such party and its legal representatives, successors and authorized assigns." (*Id*. ¶ 52.)

Following the closing of the APA, Presidio Infrastructure was merged with and into its parent Plaintiff PNSG, which thereby became the owner of the Netech business that Presidio Infrastructure had acquired in the APA. (*Id*. ¶ 53.) PNSG is a wholly-owned subsidiary of Presidio Networked Solutions LLC ("PNS"). (*Id*.) The Former Employees continued to be employed at Presidio at the closing of the APA in 2016 through their respective resignations in 2024. (*Id.* ¶ 54.) Their employer during this period was Plaintiff PNS. (*Id*.)

### D. The Engens Form PDT and Raid Presidio

PDT was incorporated in Michigan on December 29, 2020. (Compl. ¶ 55.) Its initial directors and officers were Engen, Ryan Engen, and Timothy Engen (the "Engens")—the same individuals who owned Netech before Presidio acquired it. (*Id*.) PDT performs professional and managed services and provides products of a similar nature to those provided by Presidio. (*Id.* ¶ 56.) In fact, Presidio was forced to commence litigation against PDT and several of its employees (formerly employed by Presidio) in 2021 for misappropriation of trade secrets, breach of contract, tortious interference, unfair competition, and other misconduct, in a multijurisdictional set of proceedings. (*Id*. ¶ 57.) Those proceedings concluded voluntarily in the fall of 2023, just before trial in the Ohio proceeding. (*Id*.)

E.   **The Former Employees Misappropriate Presidio Trade Secrets, Frustrate Pending Presidio Customer Opportunities, and Depart for PDT**

1.   Brehm

On January 4, 2024, just eight days before his departure from Presidio, Brehm forwarded to himself an email he had originally received from Kundert on November 20, 2023.  (Dykhoff Decl. Ex. C)  The email attached a presentation, prepared for Presidio customer REDACTED REDACTED, regarding Amazon Web Services' ("AWS") "Proactive Recapture Into Saving Management" ("PRISM") cloud-based financial managed services solution.  (*Id*.)  The presentation contained confidential Presidio information, including technology and sales strategy, discounts, and pricing.  (*Id*. ¶ 14.)  Brehm was not working on any PRISM opportunities in early January 2024.  (*Id.*)

On January 8, 2024, Zach Mulherin ("Mulherin"), a Senior Manager of Profitability Programs and Distribution Partners at Presidio, told Brehm that Presidio will be sourcing all Dell server and storage business through Arrow Electronics, Inc., an authorized partner of Dell.  (Dykhoff Decl. Ex. B)  Mulherin further explained that Presidio was beginning the process of migrating all active Dell deal registrations that will close after the go-live date of February 5, 2024, and asked Brehm whether the Dell deal registration for Presidio customer REDACTED, will close after February 5, 2024.  (*Id*.)  Without elaboration, Brehm responded that the deal "will not close and can probably be closed and lost."  (*Id*.)  To the contrary, the deal with REDACTED was not in danger of being lost.  (Dykhoff Decl. ¶ 13.)  Rather, Brehm instructed that the deal be marked closed and lost as part of the plan to divert it to PDT.  On Friday, January 12, 2024, Brehm informed his supervisor Richard Dykhoff ("Dykhoff") (a Sales VP at Presidio) that he was resigning from Presidio, effective that day.  (Korreck Decl. Ex. C.)  Later that day, Brehm sent an email to Dykhoff, confirming his immediate resignation and requesting that Presidio  "proceed with off

loading [*sic*] right away." (*Id*.) Alicia Korreck ("Korreck"), a Senior HR Business Partner at Presidio, conducted Brehm's exit interview on January 12, 2024, and Brehm maintained that he had not found a new role yet. (Korreck Decl. ¶ 10.) But Brehm started working at PDT immediately after leaving Presidio. (*Id.*)

After his exit interview, Korreck sent Brehm Presidio's standard exit email, attaching the Presidio employee exit guide and the Brehm Agreement and outlining Brehm's responsibilities during the exit process and following termination of his employment with Presidio. (Korreck Decl. ¶¶ 11-12.) In particular, Korreck reminded Brehm of his obligations under the Brehm Agreement, including that he could not "interfere with the Company's employment . . . relationships" for "a period of one year after [his] termination date." (*Id.* ¶ 11.) Korreck also reminded Brehm that he "ha[s] an obligation to keep the Company's trade secrets and other private business information confidential at all times" and to not "disclose the Company's confidential information to any third parties, including your next employer." (*Id.*)

Since Brehm left Presidio, he has been serving in substantially the same account manager role at PDT that he occupied at Presidio. He is also pursuing his old Presidio accounts using trade secrets and confidential information he received while at Presidio. For example, on his last day with the company (January 12, 2024), Brehm emailed a spreadsheet of December 2023 paid invoices from his Presidio email account to his personal Gmail account relating to Presidio customer REDACTED. (Dykhoff Decl. Ex. D.) This spreadsheet contains highly sensitive pricing and margin information of Presidio. (*Id*. ¶ 15.) This evidence shows that Brehm remains in possession of Presidio trade secrets and confidential information.

After Brehm departed Presidio, Presidio also discovered that Brehm deleted thousands of emails from his Presidio email account during the last few days at Presidio. (Barnett Decl. ¶ 15.)

Brehm also intentionally delayed opportunities during his final weeks at Presidio in order to divert those opportunities to PDT. For example, Presidio learned that, prior to his departure, there was an opportunity for deal registration with partner Nvidia for Presidio's customer, REDACTED, that was discussed between Nvidia and Brehm in early December 2023. (Dykhoff Decl. ¶ 9.) Brehm, however, did not act on the opportunity prior to his departure from Presidio. (*Id.*) Subsequently, Presidio heard from the Nvidia representative that Brehm reached out to Nvidia on behalf of PDT. (*Id.*)

  2. <u>Splinter</u>

  In the course of her role as an Inside Client Manager in Chicago, Splinter was made privy to Presidio trade secrets and confidential information relating to key customer accounts in Wisconsin and Illinois such as REDACTED, REDACTED and REDACTED. (Dykhoff Decl. ¶ 17.) Splinter was assigned to work with Brehm and Kundert in all aspects of the sales and operations functions for these Presidio customers. (*Id.* ¶ 7.) Splinter, while based in Illinois, placed the orders for Kundert and Brehm's customers, interacted with the partners, tracked sales, developed pricing and margins, and coordinated the customer requirements and implementation of Presidio technology. (*Id.* ¶ 19.)

  On Tuesday, January 16, 2024, Splinter emailed her resignation notice to her supervisor, Jeffrey Runkle[1] ("Runkle"). (Diamandis Decl. Ex. A.) On Wednesday, January 17, 2024, Alexandria Diamandis ("Diamandis"), a Presidio HR Business Partner, sent Splinter Presidio's standard exit email, attaching the Presidio employee exit guide, the Splinter Agreement, and a UPS shipping label that Splinter could use to return her Presidio-issued laptop. (Diamandis Decl. ¶ 5.)

---

[1] In early April 2024, Runkle himself also resigned from Presidio and announced that he too was going to PDT. (Diamandis Decl. ¶ 18.)

The content of and instructions in Diamandis' exit email to Splinter were substantially the same as those of and in Korreck's exit email to Brehm. (*See* Korreck Decl. Exhs. D & E.) Of particular importance, given Splinter's massive deletion of files on her Presidio laptop a few days later, was Diamandis' instruction to Splinter to "not delete anything, including any business related data" and to "not wipe [her] Presidio laptop." (Diamandis Decl. ¶ 5.) In direct contravention of Diamandis' explicit instructions to her on January 17, on January 19, 2024, Splinter deleted **7,108** files from her Presidio-issued laptop. (Scatton Decl. ¶ 9.) Several of those files related to quotes and purchase orders for Presidio customers, including REDACTED, REDACTED, and REDACTED. (*Id.*) These files turned out to be for the exact clients that Brehm and Kundert are actively pursuing at PDT following their underhanded ruse to delay Presidio's active opportunities. (*See* Dykhoff Decl. ¶¶ 9-11, 22.)

Forensic review of Splinter's Presidio-issued laptop also revealed that Splinter frequently used a Google Chrome web browser to access a Gmail account (angie.vechinski@gmail.com) from her Presidio-issued laptop between July 13, 2023, and January 19, 2024. (Scatton Decl. ¶ 7.) In particular, on January 18, 2024—Splinter's penultimate day with Presidio (and the day before she deleted thousands of files from her Presidio-issued laptop)—Splinter accessed a webpage titled "Presidio docs – angie.vechinski@gmail.com – Gmail." (*Id.* ¶ 8.) This activity indicates that there is an email entitled "Presidio docs" in Splinter's Gmail account, which was originally in the inbox and then subsequently moved to the "trash" folder. (*Id.*) Without access to Splinter's Gmail account, however, Presidio has no way to confirm whether Splinter has retained this email, or what documents (if any) were attached to it. (*Id.*)

Prior to commencing this action, Presidio requested that PDT enter into a protocol so that the parties can review Splinter's Gmail account. PDT has ignored this request.

3.  Kundert

On March 15, 2024, Kundert announced (like Brehm, without giving advance notice) his resignation from Presidio, effective that day.  Kundert emailed Korreck, copying Dykhoff (who was also Kundert's supervisor), at 10:10 a.m. EDT on March 15, 2024, and asked to be "removed from the system today." (Korreck Decl. Ex. E.)  Korreck quickly followed up, at 10:34 a.m. EDT, with Presidio's standard exit email to Kundert, attaching the Presidio employee exit guide and the Kundert Agreement, and outlining Kundert's responsibilities during the exit process and following his employment with Presidio.  (*Id*. ¶ 15.)  In that email, Korreck reminded Kundert of his obligations under the Kundert Agreement and instructed Kundert to "not delete anything, including any business related data" and to "not wipe [his] Presidio laptop." (*Id.*)  Korreck further instructed Kundert to work with his manager to return all Presidio information in his possession prior to Kundert's last day with Presidio.  (*Id.*)  Korreck also reminded Kundert that he was not to "disclose the Company's confidential information to any third parties, including [his] next employer," and otherwise was required to abide by the requirements of the attached Kundert Agreement.  (*Id.*)

Korreck held the exit interview with Kundert minutes later at 10:40 a.m. EDT.  (Korreck Decl. ¶ 16.)  During his exit interview, Kundert refused to disclose the identity of his next employer, or even whether he had another job lined up.  (*Id.*)  Kundert also admitted to Korreck during his exit interview that he had "cleaned up" his Presidio email prior to receiving Korreck's exit email (which directed him not to delete anything).  (*Id.* ¶ 17.)  Kundert claimed that he was not aware that he was not supposed to do that (*id.*), but forensic review of Kundert's Presidio email account revealed that Kundert continued to delete Presidio emails ***even after*** receiving Korreck's explicit instructions, including after the start of Kundert's exit interview.  (*Id.* ¶ 14.)  Kundert joined PDT the following week, in substantially the same role he occupied at Presidio.  (*Id.* ¶ 18.)

A forensic review of Kundert's Presidio-issued laptop revealed that Kundert deleted close to 1,600 emails during his last two days at Presidio. (Barnett Decl. ¶ 14.) Kundert also deleted approximately 1,400 files from his Presidio laptop on March 13, 2024, and cleared his web-browsing history on March 14, 2024 and March 15, 2024. (*Id.* ¶ 7.)

In addition, prior to leaving Presidio, Kundert delayed the closing dates for multiple active deals he was working on at Presidio in order to divert those opportunities to PDT. (Dykhoff Decl. ¶ 23.) For example, Presidio has also uncovered an intentional scheme by Kundert to divert the opportunities with Pure Storage Inc. ("Pure Storage"), and important partner and supplier. (*Id.* ¶ 25.) Kundert was working closely with Pure Storage representatives out of the Chicago office for a storage expansion opportunity for customer REDACTED. (*Id.*) Kundert, however, intentionally delayed the closing date of the opportunity so that he could pursue it on behalf of PDT. (*Id.*) On March 21, 2024, just a few days after Kundert resigned from Presidio, Brianna Weaver sent a misdirected email to Kundert's Presidio email address inquiring about a "visit" and asked to "sync up quickly on [REDACTED]." (*Id.*) When Presidio followed up with the email, Weaver admitted that Kundert met with Pure Storage representatives for the REDACTED storage expansion opportunity immediately after he joined PDT. (*Id.*)

Indeed, Kundert laid the groundwork for this prior to leaving Presidio. On March 12, 2024, three days before leaving Presidio, Kundert changed the contact email address for his Presidio account in Pure Storage Partner Portal from his Presidio email address to his personal Gmail address. (*Id.* Ex. G.) This change would permit Kundert to access Presidio confidential information in the Pure Storage Partner Portal after his departure from Presidio to benefit PDT and divert the emails from Presidio. (*Id.* ¶ 26.)

-13-

As another example, on March 25, 2024, Ingram Micro (which includes VMware and is a Presidio partner) sent an email to Kundert's Presidio email account, asking when Ingram Micro could "expect the ELA quote it ha[d] prepared for [Presidio] for REDACTED REDACTED [a Presidio customer that Kundert had managed] to close by the end of the month or if they will push into April."  (Dykhoff Decl. Ex. E.)  Kundert had been pursuing this deal while at Presidio; but in Presidio's Salesforce, Kundert had pushed the anticipated closing date of the deal out to October 25, 2024.  (*Id.* ¶ 24.)  Ingram Micro's March 25th email shows that the deal was supposed to close within one month—not in seven months.

Kundert also manipulated Salesforce information for his former Presidio customer, REDACTED REDACTED ("REDACTED"), to prevent Presidio from closing a deal after he left.  (Dykhoff Decl. ¶¶ 22, 27.) In December 2023, Presidio began pursuing an opportunity with REDACTED to handle the customer's 2024 Cisco SmartNet Renewal.  (*Id.*, Ex. H.)  Presidio created an entry for this opportunity in Salesforce on December 8, 2023, and it was active through March 2024.  (*Id.* ¶ 27.)  After Kundert left Presidio, however, Presidio discovered that the anticipated closing date of the opportunity had been changed to October 2024 in Salesforce.  (*Id.*)  On April 3, 2024, mere weeks after Kundert's departure, REDACTED notified Presidio without warning that it would be pursuing the opportunity with a different provider (*id.*), even though REDACTED had indicated that it intended to use Presidio for this opportunity as recently as March 26, 2024 (*id.*, Ex. H).

G.    **The Parties' Pre-Litigation Correspondence**

Presidio attempted to address Defendants' misconduct without litigation.  On April 4, 2024, Presidio sent a letter to PDT's counsel, summarizing certain of Defendants' violations and misconduct and requesting that Defendants cease and desist from, and remedy, such misconduct. Presidio proposed a protocol for the review of personal devices that the Former Employees use to

access their personal email, but as of the date of this Motion, Presidio's requests have gone unanswered.  (Compl. ¶ 102.)

### H.    Procedural Background

After PDT failed to respond to Presidio's request to review the Former Employees' personal devices, Plaintiffs filed a Complaint against Defendants on April 11, 2024.   The Complaint brings causes of action for (i) misappropriation of trade secrets against all Defendants under both the federal Defend Trade Secrets Act  ("DTSA"), 18 U.S.C. § 1836, *et seq*.; the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1, *et seq.*; and Wisconsin Uniform Trade Secrets Act ("WUTSA"), Wis. Stat. § 134.90, *et seq.*, (ii) breach of contract against Brehm, Splinter, and Kundert under Illinois and Wisconsin law for violation of the confidentiality restrictions in their respective employment agreements, (iii) tortious interference with contractual relations against PDT under Illinois law, (iv) tortious interference with business relationships or prospective economic advantage against all Defendants under Illinois law and Wisconsin law, and (vi) breach of fiduciary duty against Brehm, Splinter, and Kundert under Illinois law.

Defendants Brehm, Kundert, and PDT filed a Motion to Dismiss based on lack of personal jurisdiction on April 25, 2024 (Dkt. No. 16.), right after Plaintiffs notified Defendants of their intent to seek preliminary injunction and expedited discovery in another effort to seek a consensual protocol.   For purposes of this Motion, all claims except the breach of fiduciary duty claim are at issue.

## <u>ARGUMENT</u>

### I.    STANDARD FOR PRELIMINARY INJUNCTION UNDER RULE 65

The Court should enter a preliminary injunction to prevent further irreparable harm to Presidio's protectable business interests.   "For a preliminary injunction to issue, a plaintiff must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *A.C. by M.C. v. Metro. Sch. Distr. of Martinsville*, 75 F.4th 760, 766-67 (7th Cir. 2023) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).  Upon a showing of these factors, the court "proceeds to a balancing analysis, where the court must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.*  Presidio is entitled to preliminary injunctive relief because it satisfies each of the requisite factors.  The record evidence from both expedited discovery and the preliminary injunction hearing will further establish that Presidio has satisfied each of these factors warranting an injunction against Defendants.

## II.    PRESIDIO WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

A finding of irreparable harm absent an injunction "is a threshold requirement for granting a preliminary injunction." *Life Spine, Inc. v. Aegis Spine, Inc*., 8 F.4th 531, 545 (7th Cir. 2021) (quoting *Foodcomm Intern. v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)).  Irreparable harm is "presumed to occur when an ex-employee breaches a confidentiality agreement or a restrictive covenant." *GSI Grp., L.L.C. v. Chief Indus.*, 2021 WL 6143551, at *5 (C.D. Ill. Mar. 8, 2021). As a result of Defendants' misconduct, Presidio has already lost important pending deals and faces a substantial risk of losing more due to the Former Employees' clear propensity to inevitably use and disclose Presidio's trade secrets.  Presidio has no adequate remedy at law and faces the ongoing threat of irreparable harm unless the Court issues a preliminary injunction.  "[I]t is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) (quoting *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005)).  And, here, the full extent of Presidio's injuries are not easily ascertainable and will persist so long as the Former

Employees are able to solicit Presidio's customers and use Presidio's confidential and proprietary information to unfairly benefit PDT. *See Groupon, Inc. v. Shin*, 2022 WL 60526, at *6 (N.D. Ill. Jan. 6, 2022) ("Such harm cannot generally be easily quantified; and therefore, if disclosure is likely, the employer lacks an adequate remedy at law.") (citing *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc*., 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006)); *see also Life Spine*, 8 F.4th at 546 (finding that "identifying and quantifying lost business would be especially difficult for" plaintiff and affirming entry of injunction on trade secrets misappropriation claim).

As further detailed below, the Former Employees' seemingly coordinated resignation and subsequent employment with PDT, their access and retention of Presidio's confidential and proprietary information, and the likelihood they will imminently use and disclose Presidio's trade secrets will cause ongoing harm to Presidio for which monetary damages will not suffice. *See, e.g.*, *E\*TRADE Fin. Corp. v. Pospisil*, 2018 WL 4205401, at *5 (N.D. Ill. Sept. 4, 2018) (finding no adequate remedy at law for employee who used misappropriated trade secret information to compete with former employer because "ongoing competition itself" constitutes "a sufficient basis for relief"); *HCA Franchise Corp. v. Alisch*, 2016 WL 10706285, at *7 (N.D. Ind. Aug. 12, 2016) (former employer had no adequate remedy at law for former employee's misappropriation of trade secrets because "monetary damages are insufficient to compensate for trade secret misappropriation").

Moreover, any damage to Presidio's reputation and goodwill or subsequent erosion of its competitive position to PDT would also be irreparable. *See Mickey's Linen v. Fischer*, 2017 WL 3970593, at *18 (N.D. Ill. Sept. 8, 2017) (holding loss of competitive position justifies preliminary injunctive relief); *see also Mintel Int'l Group, Ltd. v. Neergheen*, 2008 WL 2782818, at * 5 (N.D. Ill. Jul. 16, 2008) ("loss of clients and sales and the continuing threat of further loss due to the

distribution of [plaintiff's] client lists and marketing data are sufficient to constitute irreparable injury"). Here, PDT hired the Former Employees to directly compete with Presidio on pending and existing opportunities and to leverage Presidio's success. Using the knowledge of the Former Employees and the confidential information that they took from Presidio, PDT has already been able to divert opportunities to PDT. (*See* Dykhoff Decl. ¶¶ 13, 27.) There is no reason to think Defendants will cease ongoing misconduct without injunctive relief.

## III. PRESIDIO HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

### A. Presidio Will Likely Succeed on the Merits of Its Trade Secret Misappropriation Claims Under Illinois, Wisconsin, and Federal Law

Presidio has established a strong *prima facie* case demonstrating that Defendants will illegally use and disclose Presidio's trade secrets in violation of the DTSA, ITSA, and WUTSA. Courts analyze the statutes in tandem because the "pertinent definitions … overlap." *Aptargroup, Inc. v. Chamulak*, 2019 WL 2425175, at *4 (N.D. Ill. Jun. 10, 2019). "[T]he DTSA creates a private cause of action in favor of the owner of a trade secrets that is misappropriated 'if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Mickey's Linen*, 2017 WL 3970593, at *8 (quoting 18 U.S.C. § 1836(b)(1)). To establish trade secret misappropriation under the DTSA or the ITSA, a plaintiff must show that "(1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damages the trade secret's owner." *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016). Similarly, under the WUTSA, a plaintiff must show: "(1) that the information at issue is a 'trade secret'; and (2) that 'misappropriation' or 'threatened misappropriation' of that information occurred." *Radiator Exp. Warehouse, Inc. v. Shie*, 708 F. Supp. 2d 762, 766 (E.D. Wis. 2010). All statutes provide for injunctive relief to prevent "threatened misappropriation." *See* 18 U.S.C. § 1836(b)(3); 765 ILCS

1065/3(a); Wis. Stat. § 134.90(3). Here, without injunctive relief enjoining Defendants from contacting Presidio customers and using Presidio confidential information and trade secrets, the clear and present threat posed by Defendants' misappropriation will not abate.

i.     The Statutory Definition of "Trade Secret" is Materially Identical Under Federal, Illinois and Wisconsin Law.

The evidence will show that the highly confidential Presidio information that the Former Employees used and accessed in the course of their day-to-day employment duties (and which they have subsequently retained) qualify as protectable trade secrets under Illinois, Wisconsin, and federal law. The ITSA defines a "trade secret" as "information" that: (1) "is sufficiently secret to derive economic value … from not being generally known" and (2) "is the subject of [reasonable] efforts … to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). The definition of a trade secret under the DTSA (*see* 18 U.S.C. § 1893(3)) and the WUTSA (*see* Wis. Stat. § 134.90(1)(c)) closely track the ITSA's definition. Accordingly, the Court can evaluate Presidio's threatened misappropriation claims under the three statutes in tandem.

ii.     Presidio's pricing and customer information constitute trade secrets.

The Former Employees relied upon and had access to confidential customer information pertaining to Presidio's current and prospective customers and partners, including but not limited to ██████, REDACTED, ████, REDACTED, and Pure Storage. (Dykhoff Decl. ¶¶ 9, 17, 21, 26.) The Former Employees also deleted thousands of Presidio files and emails containing Presidio's confidential pricing information and costs for Presidio's customers. (Barnett Decl. ¶¶ 7,10; Scatton ¶ 9.) Presidio's institutional knowledge of client-specific pricing and preferences enhances its customer goodwill and provides it with a competitive edge that it has refined over time. These considerations form the hallmarks of trade secrets. *See, e.g.*, *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 874 (N.D. Ill. 2001) (finding confidential customer data met the test "for

-19-

information sufficiently secret to derive economic value from not being generally known to others who can obtain economic value from its disclosure or use"); *Radiator Exp. Warehouse, Inc.*, 708 F. Supp. 2d at 767 (finding that "customer lists that contained a host of information about [plaintiff's] customers, including their buying preferences" was "highly sensitive and valuable to [plaintiff]").

In particular, Brehm and Kundert's respective roles as Senior Account Executives allowed them to develop a strong working knowledge of pricing structures, services provided, and customer feedback, among other information. (Dykhoff Decl. ¶¶ 8, 21.) Brehm and Kundert had regular direct contact with Presidio's customers and suppliers, providing them with intimate knowledge of Presidio's customers' needs and goals. (*Id.*) Splinter, as an Inside Client Manager in Illinois, also had significant customer interaction and had access to the same customer information and pricing information as Brehm and Kundert. (*Id.* ¶ 7.) In short, the Former Employees were privy to a vast array of customer-specific information on the most detailed and granular levels, including customers' preferences and Presidio's margins, costs, and designs. This knowledge provided the Former Employees with the tools to work to develop pricing models and strategies that set Presidio apart from its competitors.

Such confidential customer information is a quintessential example of protectable trade secrets. In *Vendavo, Inc. v. Long*, 397 F. Supp. 3d 1115 (N.D. Ill. 2019), this Court granted preliminary injunction finding that identification of client's issues and the plaintiff's solutions to those issues were trade secrets. Indeed, the Court found that "the pain points and their solutions are non-public and include essentially all the background work that a competitor would have to undertake before pitching their own services to the same client." *Id.* at 1132. Similarly, in *Aon PLC v. Infinite Equity, Inc.*, 2021 WL 4192072, at *16 (N.D. Ill. Sept. 15, 2021), the Court found

that client specific information can constitute trade secret when "the record contain[ed] sufficient evidence that ….client-specific information regarding the needs and preferences are confidential and derived value from their secrecy." As Senior Account Managers, both Kundert and Brehm had significant knowledge on Presidio's customers' needs and preferences, and the solutions provided by Presidio to its customers. If disclosed to PDT, such information would provide significant competitive advantage to PDT. In addition, all three Former Employees were privy to Presidio's confidential pricing and margin information, which have also been found to constitute trade secrets in this Circuit. *See PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1265 (7th Cir. 1995) (finding pricing architecture information, which includes how plaintiff prices its products in the marketplace, to be "highly confidential" and "extremely valuable to a competitor"); *see also B.C. Ziegler Co. v. Ehren*, 414 N.W.2d 48, 51 (Wis. Ct. App. 1987) (finding that information about plaintiff's transactions with its customers constituted a trade secret).

iii.    Presidio invests in and protects its trade secrets.

Presidio also implements reasonable measures to protect the strict confidentiality of its trade secrets. Among other things, Presidio requires its employees to sign non-disclosure and confidentiality agreements. (Korreck Decl. ¶¶ 3-4.) Presidio also requires employees to annually review, reacknowledge, and reaffirm their commitment to Presidio's core confidentiality and non-disclosure policies in the Employee Handbook. (*Id*. ¶ 4.) And indeed, the Former Employees signed employment agreements with Presidio in which they promised to keep its trade secrets confidential and have annually reviewed and acknowledged the Employee Handbook. (*Id*.)

These measures are reasonable and sufficient to establish trade-secret protection under Illinois and Wisconsin law. *See, e.g.*, *Vendavo*, 397 F. Supp. 3d at 1136 (holding plaintiff made reasonable efforts to protect its trade secrets by limiting access to sensitive areas and databases holding documents containing trade secrets, and requiring employees to sign non-disclosure

-21-

agreements); *Centrifugal Acquisition Corp., Inc. v. Moon*, 849 F. Supp. 2d 814, 833 (E.D. Wis. 2012) (finding that executed confidentiality agreements were sufficient to demonstrate that the Former Employees "knew or should have known that [they] had a duty of confidence"); *RKI*, 177 F. Supp. 2d at 874-75 (finding plaintiff had taken reasonable measures to maintain secrecy by providing access on a password-protected computer database and requiring employees to sign non-disclosure policy); *Strata Mktg., Inc. v. Murphy*, 317 Ill. App. 3d 1054, 1069 (1st Dist. 2000) (finding reasonable means of protecting trade secrets included "keeping information under lock and key, limiting computer access and requiring confidentiality agreements or other efforts by the employer to advise its employees that information imparted to them must remain confidential") (internal citations omitted).

iv. <u>The evidence demonstrates misappropriation of trade secrets.</u>

Plaintiffs have sufficiently demonstrated misappropriation of trade secrets. "[A] defendant's elimination of computer files…allows for an inference of misappropriation." *Mickey's Linen v. Fischer*, 2017 WL 3970593, at *11 (N.D. Ill. Sept. 8, 2017). Plaintiffs "can rely on circumstantial evidence to prove misappropriation" because "direct evidence of theft and use of trade secrets is often not available." *Aon Risk Servs. Cos., Inc. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 848 (N.D. Ill. 2019). Indeed, "a defendant's stated reason for deleting company files may be discounted where it is not credible . . ." *Mickey's Linen*, 2017 WL 3970593, at *11.

Prior to their departure and in violation of Presidio's policy, the Former Employees deleted thousands of emails and files that contained Presidio's confidential information and trade secrets during their last days at Presidio. Specifically, Kundert deleted more than 1,400 files from his Presidio-issued laptop, deleted more than 1,600 emails from his Presidio email account, and deleted his web-browsing history from his Presidio-issued laptop on his last days at Presidio. (Barnett Decl. ¶¶ 7, 10, 14.) During his exit interview with Korreck, when Korreck instructed

-22-

Kundert not to delete any Presidio documents or files, he claimed that he had already "cleaned up" his email inbox because he was unaware of such instructions. (Korreck Decl. ¶¶ 14, Ex. F.) Forensic review of Kundert's Presidio email account, however, revealed that Kundert **continued to delete** his Presidio emails during and after his exit interview, discrediting his excuse that he was unaware of any restrictions on deletion. (Barnett Decl. ¶ 14; Korreck Decl. ¶¶ 14-16.)

Brehm similarly deleted more than 5,000 emails and files from his Presidio email account during his last two days at Presidio. (Barnett Decl. ¶ 15; Korreck Decl. ¶ 8.) Brehm also engaged in an odd behavior of emailing confidential Presidio files from his Presidio email account to his Presidio email account. (Barnett Decl. ¶ 16.) Kundert did the same. (*Id*.) There is no reasonable explanation for Kundert and Brehm to email confidential Presidio files from their own Presidio email addresses to their own Presidio email addresses, other than to engage in misappropriation. (Barnett Decl. ¶ 17.) Splinter also deleted more than 7,000 files from her Presidio laptop on her last day at Presidio (Scatton Decl. ¶ 9; Diamandis Decl. ¶ 4), and forensic evidence revealed that she regularly accessed her personal Gmail account while working at Presidio. (Scatton Decl. ¶ 7.) Since there should be no reason for the Former Employees to engage in massive deletion of Presidio files other than to cover up misconduct, the Court must infer that they deleted files and other information in order to hide evidence of misappropriating Presidio's confidential information and trade secrets.

The Court's holding in *Mickey's Linen* is instructive. In *Mickey's Linen*, the Court found that there was in inference of trade secret misappropriation when the former employee wiped all customer and other customer information from his company-issued cell phone before returning it. 2017 WL 397593, at *11. The Court also considered the former employee's lack of credibility when he lied about his plans to go to work for Mickey's key competitor and why he had so few

documents to return at the time of his departure. *Id.* As a result, the Court inferred from "the substantial circumstantial evidence of Fischer's misappropriation that he improperly took at least some of Mickey's trade secret documents with him, and downloaded and/or transferred some of Mickey's trade secrets from his company cell phone before he deleted all evidence of such transfers from that device." *Id.* at *12. The Court found that Mickey's demonstrated a likelihood of success on its trade secrets claims under the ITSA and DTSA. *Id.* at *13; *see also Moss Holding Co. v. Fuller*, 2020 WL 1081730, at *7 (N.D. Ill. Mar. 6, 2020) (finding that circumstantial evidence supported plaintiff's claim of misappropriation).

In addition, under Illinois law, trade secret misappropriation claims may proceed on an inevitable disclosure theory, which enables a plaintiff to "prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995); *accord Strata Mktg.*, 317 Ill. App. 3d at 1070 ("*PepsiCo* correctly interprets Illinois law …."). Courts in this District have repeatedly analyzed inevitable disclosure claims under both the ITSA and DTSA, "which suggests that the doctrine is available in either context." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1069 n.7 (N.D. Ill. 2020) (citing cases); *see also Groupon*, 2022 WL 60526, at *3-6 (analyzing inevitable disclosure claim under both statutes). To prevail, the plaintiff must demonstrate "that the employee 'cannot operate without inevitably disclosing the confidential information.'" *Allied Waste Servs. N. Am., LLC*, 177 F. Supp. 3d at 1112 (quoting *Complete Bus. Sols., Inc. v. Mauro*, 2001 WL 290196, at *6 (N.D. Ill. Mar. 16, 2001)).

When evaluating whether the disclosure of trade secrets is inevitable, courts consider three factors: "(1) the level of competition between the former and new employer; (2) whether the

-24-

employee's new position is comparable to the position he held with the former employer; and (3) the actions of the new employer to prevent the employee from using or disclosing trade secrets of the former employer." *Aon PLC*, 2021 WL 4192072, at *18 (citation omitted). Courts afford less weight to the third factor, however, because "a complaint is not likely to contain any allegations about what, if anything, the competitor did to safeguard the plaintiff's secrets." *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 2017 WL 1954531, at *5 (N.D. Ill. May 11, 2017).

Presidio has satisfied the requisite elements to establish the inevitable disclosure and threatened misappropriation of its trade secrets. First, Presidio and PDT are direct competitors as both companies provide the same services and compete for the same customers to provide the same services. (Compl. ¶ 56.) But PDT is no ordinary competitor of Presidio—it is a carbon copy of a company that PDT's founders sold to Presidio in 2016. (*Id.* ¶ 55.) In fact, PDT was founded and established by raiding and soliciting Presidio employees in the same region Presidio operates. (*Id.* ¶ 57.)

Second, PDT has hired the Former Employees in the exact same roles to function exactly as they did at Presidio, by working closely with clients to understand their budgets, needs, wants, and goals for purposes of developing pricing strategies and offerings. This is exactly the kind of information that PDT can use to (i) unfairly compete with Presidio, (ii) undercut its pricing based on stolen information, and (iii) unfairly undermine Presidio's competitive advantage. In fact, PDT has already benefited from the Former Employees' knowledge of Presidio's customers and pricing by diverting opportunities, like REDACTED, REDACTED, and REDACTED from Presidio. (Dykhoff Decl. ¶¶ 11, 24-25, 27.)

Third, despite knowledge of the Former Employees' post-employment obligations not to disclose Presidio's confidential information, PDT hired the Former Employees in directly

competitive roles and encouraged the use and disclosure of Presidio's confidential information. The Former Employees deleted thousands of emails and files right before leaving Presidio and intentionally delayed opportunities that were pending with Presidio in order to divert them to PDT. Immediately after the Former Employees joined PDT, partners and customers of Presidio notified it that they would be moving their business to PDT. This evidences Defendants' coordinated efforts to misappropriate Presidio's confidential information and trade secrets in order to steal Presidio's business and customers for PDT's benefit. Thus, PDT has not only taken no action to prevent the Former Employees' unlawful disclosure of trade secrets, but instead has actively facilitated it.

Undoubtedly, the Former Employees' roles at PDT will lead to the imminent and inevitable disclosure of Presidio's trade secrets and will allow PDT to further benefit from the use of Presidio's confidential and proprietary information. The Former Employees cannot help but use and rely upon the confidential and proprietary information that they acquired while working at Presidio, especially given that PDT hired the Former Employees in the exact same roles that they held at Presidio. The Former Employees inevitably will draw upon Presidio's pricing strategies and project plans to compete with Presidio for its customers' finite spend. *See, e.g.*, *Groupon, Inc.*, 2022 WL 60526 at *6 ("Groupon has shown that Mr. Shin left Groupon for a substantially similar position with a competitor, and the disclosure of trade secrets . . . is inevitable"); *Mickey's Linen*, 2017 WL 3970593, at *13 (former employer established former employee and competitor threatened to misappropriate trade secrets by demonstrating employee was a key account representative before joining former employer's competitor in a comparable role and failing to return former employer's confidential documents). Presidio is thus likely to succeed on the merits of its misappropriation claims.

-26-

### B.  Presidio is Likely to Succeed on Its Breach of Contract Claims

The Former Employees unquestionably breached and will continue to breach their respective Agreements, which are valid and enforceable contracts.  Under Illinois law, the essential elements of a breach of contract claim are: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) resulting injury to the plaintiff.  *Wolff v. Bethany N. Suburban Grp.*, 197 N.E.3d 77, 91 (1st Dist. 2021).  The elements of a breach of contract claim are similar under Wisconsin law.  *See Brew City Redevelopment Grp., LLC v. Ferchill Grp.*, 714 N.W.2d 582, 588 (Wis. Ct. App. 2006) ("A complaint states a claim for breach of contract when it alleges: (1) a contract between the plaintiff and the defendant that creates obligations flowing from the defendant to the plaintiff; (2) failure of the defendant to do what it undertook to do; and (3) damages").

The Agreements are valid and enforceable contracts under ordinary contract principles because they manifest mutual assent by the parties and are supported by adequate consideration.  *Reliable Fire Equip. Co. v. Arredondo*, 965 N.E.2d 393, 396 (Ill. 2011) (employment agreements "will be upheld if it contains a reasonable restraint and the agreement is supported by adequate consideration").  Furthermore, sufficient consideration and performance have been satisfied by Presidio providing the Former Employees with employment.[2]

---

[2] It is possible that Defendants will raise a "standing" defense relating to the contracts arising from the Netech acquisition.  Two other Federal Courts have addressed this argument.  Judge Shalina D. Kumar of the Eastern District of Michigan rejected the standing defense, holding that under that under Michigan law "Netech validly assigned the [a]greements to Presidio and therefore Presidio is entitled to the same benefits and protections the [a]greements afforded Netech."  *People Driven Technology, Inc. v. Presidio Inc.*, 2023 WL 4932078, at *1 (E.D. Mich. Aug. 2, 2023).  When the individual defendants argued that "PNS cannot enforce the [a]greements," Judge Kumar further held that "PNS may enforce the [a]greements as the parent corporation to PNSG, the [a]greements' assignee."  *Id.*  Chief Judge Algernon Marbley in the Southern District of Ohio reached a different conclusion in *Presidio, Inc. v. People Driven Technology, Inc.*, 2023 WL 5178345 (S.D. Ohio, Aug. 11, 2023) under Ohio law.

The restrictive covenants in the Agreements are reasonably related to the protection of Presidio's legitimate business interests in maintaining the confidentiality of its pricing strategies, its customers, and their particular projects and preferences. Specifically, section 1 of the Agreements prohibit the Former Employees from using or disclosing any confidential and proprietary information without Presidio's written consent. (*See* Korreck Decl. Exhs D & F; Diamandis Decl. Ex. B.) Protecting this information constitutes a legitimate interest under Illinois and Wisconsin law. *See, e.g.*, *Fisher/Unitech, Inc. v. Computer Aided Tech., Inc.*, 2013 WL 1446425, at *3 (N.D. Ill. Apr. 9, 2013) ("There is no question that protecting confidential operational and customer information is a legitimate, protectable business interest of an employer"); *Millard Maint. Serv. Co. v. Bernero*, 566 N.E.2d 379, 386 (Ill. App. Ct. 1990) ("In Illinois, an employer has a protectable interest in its customers"); *McElroy, Inc. v. Delaney*, 389 N.E.2d 1300, 1307 (Ill. App. Ct. 1979) (holding the "advantage gained by the potential use of confidential information is a legitimate business interest protectable by [a restrictive] covenant"); *Techworks, LLC v. Wille*, 770 N.W.2d 727, 735 (Wis. Ct. App. 2009) ("customers [are] the most valuable asset of the enterprise. In recognition of this fact, customer goodwill has been recognized as a property interest in and of itself").

Here, the Former Employees' misconduct has made it clear that they "present a substantial risk to [Presidio]'s relationships with [its] customers or with respect to confidential business information." *Fields Found., Ltd. v. Christensen*, 309 N.W.2d 125, 129 (Wis. Ct. App. 1981). The Former Employees' roles at Presidio exposed them to the identities of Presidio's former, current, and prospective customers; their needs; and the strategies, both effective and ineffective, utilized to achieve the objective of securing business. (Dykhoff Decl. ¶¶ 7, 8, 21.) The Former Employees have intimate knowledge of Presidio's pricing models and strategy, which allowed them to negotiate and offer pricing to customers based on their budget and needs.

This confidential information allowed the Former Employees to maintain relationships with Presidio's clients, which they have already begun to exploit in their new roles at PDT. Specifically, the Former Employees breached their obligations under the Agreements by accessing and retaining Presidio confidential information, manipulating Presidio's SalesForce data, and consequently diverting Presidio opportunities to PDT. The Former Employees will continue to breach their obligations in their substantially similar job duties and responsibilities for PDT, and by necessarily using Presidio's confidential and proprietary information. The Former Employees' use and disclosure of Presidio's confidential information has harmed and will continue to harm Presidio. Accordingly, Presidio has demonstrated a substantial likelihood of success on the merits of its breach of contract claims. *See GSI Grp., L.L.C.*, 2021 WL 6143551, at *2-3 (granting a TRO, and later a preliminary injunction, with regards to an employee confidentiality agreement restricting the disclosure of any trade secrets, including customer lists and product price lists, as "the Confidentiality Agreements protect[ed] a limited subset of valuable, nonpublic confidential business information").

### C. Presidio is Likely to Succeed on the Merits of its Tortious Interference Claims

i. PDT tortiously interfered with the Agreements.

Presidio is likely to succeed on its claim against PDT for tortious interference with contract. To prevail on a tortious interference claim under Illinois law, Presidio must prove: (1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) a subsequent breach of contract caused by defendant's wrongful conduct, and (5) damages. *See Medcor, Inc. v. Garcia*, 2022 WL 124163, at *10 (N.D. Ill. Jan. 13, 2022).

Here, the Former Employees signed valid and enforceable agreements with Presidio prohibiting them from disclosing Presidio's trade secrets and confidential information. PDT is well aware of the Former Employees' employment agreements, especially given PDT's long history of hiring Presidio employees who are subject to confidentiality and non-solicitation agreements. PDT cannot "intentionally ignore" the Former Employees' agreements and induce them to disclose Presidio's confidential information and trade secrets in order to directly compete with Presidio. *GSI Grp., LLC*, 2021 WL 6143551, at *5 (finding likelihood of success on tortious interference with contractual relations claim when plaintiff claimed that defendant induced employee to breach his confidentiality agreement with plaintiff by requesting the employee to make "product improvement[s] to its grain bin design").

Although PDT knew that the Former Employees were bound by their agreements with Presidio, PDT nonetheless induced the Former Employees to breach by employing them. PDT took these actions to interfere with Presidio's business and to unlawfully compete in the marketplace. As a result of PDT's tortious interference with contractual relations, Presidio has suffered and will continue to suffer damages and irreparable harm, including diminished value of its confidential information, costs of replacing long-tenured employees, and loss of its competitive advantage. Because Presidio is able to establish each of the elements of its tortious interference with contractual relations claim, it has demonstrated a likelihood of success on this claim.

  ii.  <u>At PDT's direction, the Former Employees utilized wrongful means to divert opportunities from Presidio to PDT</u>.

Defendants have tortiously interfered with Presidio's business relationships and prospective economic advantage. To prevail on a claim for tortious interference with prospective economic advantage under Illinois law, a plaintiff must show that (1) plaintiff had a reasonable expectation of entering into or continuing a valid business relationship with a third-party; (2)

defendant knew of that expectation; (3) defendant intentionally and without justification interfered with that expectation; (4) defendant's interference prevented plaintiff's legitimate expectancy from ripening into a valid business relationship; and (5) plaintiff suffered damages because of the interference. *See Jim Mullen Charitable Found. v. World Ability Fed'n, NFP*, 917 N.E.2d 1098, 1111 (Ill. App. Ct. 2009). Wisconsin law requires a similar showing. *See IFS Filing Sys. LLC v. 11225 Heather LLC*, 923 N.W.2d 176, 2018 WL 5920614, at *9 (Wis. Ct. App. Nov. 13, 2018).

Here, Defendants knew of Presidio's expected business with the customers for which the Former Employees were responsible for pursuing and servicing while employed by Presidio. At the time of the Former Employees' departure, Presidio was pursuing several active opportunities with these customers, including opportunities that it had won previously. But the Former Employees, at PDT's direction, have misappropriated Presidio's confidential information and manipulated Presidio's SalesForce data to prevent Presidio from closing these deals. (*See, e.g.*, Dykhoff Decl. ¶¶ 13, 14, 22, 24-27.) The calculated and deliberate diversion of important business opportunities, such as REDACTED, REDACTED, and REDACTED has already harmed Presidio. (*Id.* ¶¶ 11, 24-25, 27.) There is no limit to the damage Defendants could cause without the requested relief. Because Presidio establishes all the elements of its tortious interference with prospective economic advantage claim, it has demonstrated a likelihood of success on this claim too.

## IV. THE BALANCE OF HARDSHIPS STRONGLY FAVORS PRESIDIO AND THE ISSUANCE OF A PRELIMINARY INJUNCTION WILL NOT DISSERVE THE PUBLIC INTEREST

The balance of hardships weighs in Presidio's favor given the clear and actual threat that the Former Employees' employment with PDT presents here. Enjoining Defendants from using Presidio's confidential data would not harm the public interest. When determining whether to grant a preliminary injunction, courts "weigh[] the harm of denying an injunction [to the moving party] against the harm to [the non-moving party] of granting one." *Groupon*, 2022 WL 60526, at *6. The

Seventh Circuit "employs a sliding scale approach for this balancing: if a movant is more likely to win, the balance of hardships can weigh less heavily in its favor, but the less likely a movant is to win the more that balance would need to weigh in its favor." *W. Capra Consulting Grp., Inc. v. Snyder*, 2019 WL 3935045, at *7 (N.D. Ill. Aug. 20, 2019) (internal citations and quotations omitted); *see also Life Spine*, 8 F.4th at 539 ("If the plaintiff is likely to win on the merits, the balance of harms need not weigh as heavily in his favor."). And, "[i]n balancing the harms, the Court also considers the public interest." *Groupon*, 2022 WL 60526 at *6 (internal citation omitted).

Here, the requested injunctive relief seeks only to ensure that the Former Employees abide by their contractual duties and statutory duties under Illinois and federal law, and that PDT complies with its settlement obligations. Because the potential harm to Presidio stemming from the Former Employees' employment with PDT and their inevitable use of Presidio's trade secret information is great and incalculable here—while the potential harm to Defendants is negligible, the balance of harms weighs in favor of injunctive relief. *See, e.g., Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (balance of irreparable harms weighed "heavily" in employer's favor where former employee possessed confidential information directly relevant to new position with competitor); *Mickey's Linen*, 2017 WL 3970593, at *19 (finding that balance of harms favored plaintiff who "stands to suffer considerable non-compensable and/or uncollectable losses if an injunction were denied"); *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657-58 (7th Cir. 2006) (finding balance of harms favored plaintiff in inevitable disclosure case where plaintiff would be subject to "substantial injury" without an injunction).

Entering a Preliminary Injunction to prevent misappropriation of trade secrets will not disserve the public interest. It is well-settled that the public interest "favors the protection of trade

secret and confidential information gathered and developed by a company at significant expense." *Groupon*, 2022 WL 60526, at \*7.  The public interest also favors fair competition in markets that can be achieved without the improper use of confidential information or trade secrets to damage a close competitor's competitive edge.  *See Aon PLC*, 2021 WL 4192072, at \*32 (finding public interest favored injunction to prevent defendant's inevitable disclosure of plaintiff's trade secrets).  Further, the public interest would be served by an injunction because the Former Employees still retains the right "to work [successfully] in his chosen field."  *Mickey's Linen*, 2017 WL 3970593, at \*19 (quoting *Brown & Brown, Inc. v. Ali*, 592 F. Supp. 1009, 1046 (N.D. Ill. 2009)); *see also Lucini Italia Co. v. Grappolini*, 2003 WL 1989605, at \*18 (N.D. Ill. April 28, 2003) (public interest was served by issuance of an injunction protecting plaintiff from future misuse of its trade secret information).  All relevant factors weigh in favor of granting Presidio the injunctive relief it so desperately needs at this time.

## **CONCLUSION**

For the reasons set forth above, Presidio respectfully asks this Court to enter a preliminary injunction, in the form attached hereto:

(i)  enjoining and restraining Defendants, as well as all persons acting in concert with them, from directly or indirectly using, disclosing, copying, or transmitting Presidio's confidential or trade secret information for any purpose, pending full resolution of this action;

(ii) requiring Defendants, as well as all persons acting in concert with them, to return to Presidio all originals, copies, or other reproductions in any form whatsoever, of any record or document containing, in whole or in part, any confidential information or trade secrets belonging to Presidio; and

(iii) requiring that Defendants preserve, not tamper with or modify in any way, their

personal computers, phones, email accounts, cloud-based repositories, or any other electronic devices that they have used in the last year (the "Devices"), and produce such Devices to a third-party forensics vendor designated by Presidio for forensic imaging.

To the extent the requested Preliminary Injunction cannot be granted without a hearing, Presidio respectfully requests that the Court (i) schedule this matter for preliminary injunction hearing as soon as the Court's schedule permits following a period of expedited discovery; and (ii) upon completion of the hearing, to enter the accompanying preliminary injunction.

Dated: April 29, 2024

Respectfully submitted,

PRESIDIO HOLDINGS INC.
PRESIDIO NETWORKED SOLUTIONS LLC
PRESIDIO NETWORKED SOLUTIONS GROUP, LLC


By: /s/ *Kevin M. Cloutier*
One of Their Attorneys

Kevin M. Cloutier (ARDC #6273805)
David M. Poell (ARDC #6302765)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Email: kcloutier@sheppardmullin.com
          dpoell@sheppardmullin.com

Robert S. Friedman (*pro hac vice*)
Shin Hahn (*pro hac vice*)
Joshua I. Schlenger (*pro hac vice*)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 653-8700
Email: rfriedman@sheppardmullin.com
          shahn@sheppardmullin.com
          jschlenger@sheppardmullin.com

*Attorneys for Plaintiffs*

-34-